# EXHIBIT A

| **National City** | EQUITY RESERVE℠ AGREEMENT – NATIONAL HOME EQUITY |
|---|---|
| | (Not to be Used for Lines Secured by a Texas Homestead) |
| | Date: 3/10/2005   Account No.: 0003894788 |

You, the undersigned, are opening an Equity Reserve Line of Credit (Line) with National City Bank (Bank) and agree that the following terms and conditions will apply to your Line.

**Line of Credit.** Your Line is an open-end line of credit which you may use to obtain cash advances (Advances) from time to time for a period of 10 years (Draw Period). If you continue to meet Bank's then current credit and collateral value criteria, at Bank's discretion, Bank will either extend the Draw Period for one or more additional Draw Periods or Bank may refinance your Line on the terms then being offered by Bank for Equity Reserve Lines of Credit. If your Draw Period is not renewed or the Line refinanced, you may repay any outstanding balances during the Repayment Period as provided in the Payment section below. The initial amount of your Line is $ 200,000.00 (Credit Line). You have the option anytime during the Draw Period of this Agreement to create Fixed Rate Partitions of all or part of your Line at a fixed rate and for a fixed payment. The Fixed Rate Partition (FRP) balance includes the partition advance fee. Any amount you repay on the Line and/or on an FRP will be again available to you on the Line until the end of the Draw Period. Bank may reduce the amount of your Credit Line under certain conditions described in this Agreement.

**Advances.** You may obtain Advances under your Line by issuing Equity Reserve checks and special FRP checks (Checks) supplied by Bank, or by way of any other Bank approved plan. Bank will charge your Checks directly against your Line. You may make arrangements for an Advance on your Line to pay off any FRP at any time by contacting Customer Service at the address or phone number on your statement. You should notify Bank when you need more Checks. The minimum FRP Advance that you can receive using an FRP Check is $5,000. FRP checks for less than $5,000 will be charged against your Line. You should also notify Bank immediately if your Checks are lost or stolen. (Please see the "Stop Payment Orders" section of this Agreement). Your statement will list Checks that have been paid, but the actual paid Checks will not be returned to you. You may request copies of paid Checks from the Bank, and a copying fee may be charged.

Bank may issue you a Card or Cards for use with the Line. Credit card access is not offered in Connecticut, New York and Texas and may not be offered in other states. The word Card can mean one or more credit cards or Automated Teller Machine (ATM) cards. You authorize Bank to issue you a Card for use with the Line. You may purchase goods or services from merchants who honor the Card. You may obtain Advances from Bank or any other financial institution that honors the Card. You may also obtain Advances by using a Personal Identification Number (PIN) for telephone banking or on-line banking Advances. Bank will charge all Advances to your Line. If you allow someone else to use your Card or PIN and you want to stop such use, you must let Bank know in writing. If he or she has a Card or PIN, you must return the Card with your written notice and/or request a new PIN. You must notify Bank immediately if your Cards or PIN are lost or stolen, or you believe that some person may be using your Card(s) or PIN without permission. You will not use your Line after notifying Bank of loss, theft or unauthorized use of your Card(s) or PIN. You will not be held liable for any unauthorized use of the Card or PIN after you have notified Bank of the loss or theft by phone at 1-800-533-6596 or in writing at National City Card Services, P.O. Box 4092, Kalamazoo, Michigan 49003. (Otherwise you may be liable, but not for more than $50.) Bank may terminate the use of your Card or PIN if you lose your Card or PIN two times or more in a twelve month period. Bank may also terminate the use of your Card or PIN if your new balance exceeds your Credit Line by 2% or if you are over limit for more than one billing cycle.

Bank will have no obligation to honor any Advance by any means if the resulting new balance of your Line would exceed your Credit Line; or after the Draw Period ends; or in the event of termination or suspension of your Credit Line under the conditions described in this Agreement, and upon Bank's request you will return Checks and/or Cards. Your Line may not be used for Internet lottery, betting or gambling transactions or for any illegal transactions.

Charges from foreign merchants and financial institutions may be made in a foreign currency. We will bill you in U.S. Dollars based on the exchange rate on the day we settle the transaction, plus any special currency exchange charges. In the case of VISA Accounts: The exchange rate applied to each such transaction is a (A) wholesale market rate or (B) government-mandated rate, in effect one day prior to the processing date, increased by one percent. Because of the special charges and possible differences in exchange rates between the time we settle and the time you initiated the transaction, the total charge for a foreign transaction may be greater than the cash advance or purchase at the time it was made.

**Finance Charge for Line and Fixed Rate Partition Advances and During the Repayment Period.**

a) Line Advances: Bank figures the finance charge on your Line by applying the periodic rate to the "average daily balance" of your Line. To get the "average daily balance", Bank takes the beginning balance of the Line each day, adds any new Advances including if applicable, the broker and processing fees, and other debits, and subtracts any payments or credits and unpaid periodic finance charges. This gives the daily balance. Then, Bank adds up all the daily balances for the billing cycle and divides the total by the number of days in the billing cycle. This gives the "average daily balance".

Advances are subject to finance charges from the date of transaction to the date payment is posted to the Line. The periodic rate of finance charge and the annual percentage rate are subject to change, based on the value of an Index. The Index in effect for each billing cycle shall be the "Prime Rate" of interest appearing in the Money Rates Table of The Wall Street Journal published on the first day of your Billing Cycle (or, if not published on that date, the last edition published prior to that date), rounded upward, if necessary, to the nearest .01% (Line Index).

The **ANNUAL PERCENTAGE RATE** is the Line Index plus 0.500 %. The **FINANCE CHARGE** for each billing cycle shall be computed at the annual percentage rate divided by 12. The current periodic rate of **FINANCE CHARGE** is 0.500 % per month, which corresponds to an **ANNUAL PERCENTAGE RATE** of 6.000 %.

The annual percentage rate and the periodic rate of finance charge may increase if the Line Index increases. In the event of an increase, the finance charge will increase and the minimum payment amount may increase. An increase or decrease in the annual percentage rate will result in a corresponding increase or decrease in the minimum payment amount.

b) Fixed Rate Partition Advances: Bank figures the finance charge on each FRP by applying the periodic rate to the "average daily balance" of the FRP. To get the "average daily balance", Bank takes the beginning balance of the FRP each day and subtracts any payments or credits and unpaid periodic finance charges. This gives the daily balance. Then, Bank adds up all the daily balances for the billing cycle and divides the total by the number of days in the billing cycle. This gives the "average daily balance".

Each FRP is subject to finance charges from the date of the transaction until paid in full. The periodic rate of finance charge and the annual percentage rate are determined and fixed on the business day the transaction posts to your Line. The Index shall be the daily rate for 3 year Treasury notes with constant maturities for the 10th business day prior to the last business day of the calendar month preceding the month in which the transaction posts to your Line, rounded upward, if necessary, to the nearest .01% (FRP Index). The FRP Index can be found in the Federal Reserve Statistical Release H. 15 at www.federalreserve.gov/releases/h15.

The **ANNUAL PERCENTAGE RATE** is the FRP Index plus 4.250 %. The **FINANCE CHARGE** for each billing cycle shall be computed at the annual percentage rate divided by 12. The current periodic rate of **FINANCE CHARGE** is 0.644 % per month, which corresponds to an **ANNUAL PERCENTAGE RATE** of 7.730 %.

c) Both Line and Fixed Rate Partition Advances: In no event shall the periodic rate of **FINANCE CHARGE** be more than 1.50% per month or less than 0.25% per month and in no event shall the **ANNUAL PERCENTAGE RATE** be more than 18.0% or less than 3.0%. The annual percentage rate includes only interest and not other costs. Your monthly statement will disclose the applicable annual percentage rate for the billing cycle.

d) Repayment Period: Any outstanding Line balance and Other Charges will be converted to a Fixed Rate Partition balance on the last business day of your Draw Period and will be subject to finance charges for a Fixed Rate Partition as stated in subsections (b) and (c) above. The Index value is the FRP Index on the 10th business day prior to the last business day of the calendar month preceding the month in which the Draw Period ends rounded as provided in subsection (b) above.

Other Finance Charges.    A broker fee **FINANCE CHARGE** of $ 0.00
A processing fee **FINANCE CHARGE** of $ 0.00
A Partition Advance fee **FINANCE CHARGE** of $50 for each Fixed Rate Partition used.

NHEAGMT1 (07/04)



ERA-MULTI-V1_1

Other Charges. In addition to finance charges, the following other charges will apply:

- An annual fee of $50 reflected on the monthly statement for the first billing cycle of each year of your Draw Period beginning with the 13th billing cycle, whether or not you obtain Advances under your Line. This fee is not refundable.
- A late payment fee of the greater of 10% of the unpaid minimum payment or $40, if Bank does not receive your minimum payment at the address shown on your statement within 10 days of the Due Date. Bank may charge an additional late payment fee for each billing cycle that your Line is past due.
- An over limit fee of $25 whenever you go over your Credit Line. Bank may charge an additional $25 for each billing cycle that you remain over your Credit Line.
- A returned payment fee of $25 if you make a payment on your Line which is returned to Bank unpaid because of insufficient funds, a closed account, stop payment, or any other reason.
- A returned check fee of $25 if you write a Check that Bank dishonors under the "Advances" section of this Agreement.
- A stop payment fee of $25 for the service of stopping payment on a Check and a $25 service fee for renewal of each stop payment order.
- An early termination fee of $_____0.00_____ if you close your Line within the first 36 months.
- A document request fee of $6 per copy for service of providing copies. Bank will not charge you for documents Bank is required to give you by law.
- Any real estate related closing fees due at the closing of your Line are reflected on the HUD1 settlement statement provided to you by the closing agent and which is hereby incorporated and made part of this Agreement by this reference.

Bank does not lose any of its other rights under this Agreement whether or not it charges late payment or over limit fees. The application of any fee shall not cure the default which initiated the fee.

Security Interests. Your Line will be secured by a mortgage (Mortgage) on your dwelling (Dwelling). If the Dwelling is your primary or secondary residence, you represent and warrant to Bank that at all times during the term of this Agreement your Dwelling, or a minimum of one unit of your multi-unit Dwelling, shall be occupied by you and shall not be used as rental property. Bank agrees to waive any security interest in the Dwelling to the extent it secures Advances which may be in excess of your Credit Line. You name Bank as loss payee and beneficiary of the proceeds of, and assign to Bank any unearned premiums of, all insurance connected with your Line. You must not adversely affect Bank's interest in the Dwelling by any action or inaction. You must keep the Dwelling in good condition, promptly pay all mortgages and other liens against the Dwelling, and promptly pay all taxes and assessments on the Dwelling. You must not sell or transfer title to the Dwelling without Bank's permission, or use the Dwelling for any illegal purpose.

Property Insurance. You must keep the Dwelling fully insured against loss or damage on terms which are acceptable to Bank to the extent permitted by law. You must carry flood insurance if required by federal law. You may obtain property insurance or furnish existing property insurance from anyone that is acceptable to Bank provided the insurer is authorized to do business in the state or jurisdiction where the Dwelling is located or is an eligible surplus lines carrier. You agree to furnish Bank with written evidence of such insurance, with Bank named as loss payee and proof of payment of insurance premiums. If you fail to do so, Bank may buy insurance to protect Bank's interest and add the premium cost to the unpaid balance of your Line, subject to the same finance charges as Advances against your Line. You assign to Bank the proceeds from any such insurance policies up to the unpaid balance of your Line. Bank may apply such proceeds, including any return of unearned premiums and payments for claims under such policies, to reduce the unpaid balance of your Line. You irrevocably authorize Bank as your agent and on your behalf to negotiate, settle and release any claim under your insurance and to submit insurance claims for you and to receive and sign your name to any checks or drafts or related papers obtained from insurance companies.

Tax Deductibility. You should consult a tax advisor regarding the deductibility of interest and charges on your Line.

Statements. Bank agrees to mail or deliver to you a monthly statement for each billing cycle at the end of which there is a balance which is a debit or credit balance of more than $1 or on which a finance charge has been imposed. The balance is the sum of all outstanding Advance(s), fees, payments, other credits, other charges and debits, and finance charge(s).

Payments. Your payments will be due monthly. You may pay the entire unpaid balance of your Line and/or your FRP(s) at any time. You are required to pay a minimum payment by the Due Date shown on your statement equal to the sum of the Line Minimum Payment and the FRP Minimum Payment for each FRP in use.

a) Line Minimum Payment: The Line Minimum Payment will equal the periodic finance charges that accrued on the outstanding Line balance during the preceding billing cycle as shown on each monthly statement (Interest Only Minimum Payment).

b) The FRP Minimum Payment is: A fixed payment amount that is sufficient to pay off the Partition Advance Fee, the balance and periodic finance charges for each FRP, if one hundred twenty (120) equal payments at the fixed rate applicable to that FRP were made. Any amount still owing after one hundred nineteen (119) billing cycles will be added to the final minimum payment due. Additional payments on any FRP may be made at any time but you will continue to be obligated to make the fixed payment for the FRP as long as any amount is still owing on the FRP. The amount of any reduction in principal from a payment on an FRP will become available to you on your Line once it is posted, until the end of the Draw Period. If your Draw Period is not renewed then access to the Line will not be available during the Repayment Period.

c) Repayment Period: The Minimum Payment may not fully repay the principal that is outstanding by the end of the Draw Period. If your Draw Period is not renewed for an additional term, during the Repayment Period you may continue to make scheduled payments on any Fixed Rate Partition balances outstanding at the end of the Draw Period until they are paid in full. Additionally, any outstanding line balance and Other Charges will be converted to a Fixed Rate Partition balance without a Partition Advance fee on the last business day of your Draw Period and will be subject to finance charges for a Fixed Rate Partition, and will be required to be repaid in one hundred twenty (120) equal monthly payments for balances of $5,000 or more; or sixty (60) equal monthly payments for balances of less than $5,000. Any amount still owing after one hundred nineteen (119) billing cycles or after fifty nine (59) billing cycle respectively, will be added to the final minimum payment due.

Payments will be applied in the following order: First, to each FRP on a first in-first out basis for all unpaid periodic finance charges and then to the FRP's principal balance in an amount necessary to amortize the FRP within its amortization schedule, then to all unpaid periodic finance charges on the Line, then to all Other Charges, then to the Line. For introductory and promotional offer balances, payments to the Line are applied on the basis of the lowest rate balance first to highest rate balance last. If there are no balances on the Line, overpayments are applied as a prepayment to the FRP(s) on a first in-first out basis. If there are no balances on any FRP or on the Line, overpayments are credited to you on the Line and returned upon request. In order to make additional partial prepayments to an FRP or to prepay an FRP in full without paying off your Line, you must contact Customer Service to make arrangements to do so.

Stop Payment Orders. We agree to honor a stop payment order against a Check when received from you within a reasonable time prior to payment. A stop payment order becomes effective after we have actually received the order and had a reasonable time to process it, and the order will remain in effect for thirteen months. Our acceptance of a stop payment order does not mean that the Check has not yet been paid, and we shall have no liability resulting from the payment of a Check before your stop payment order becomes effective. A stop payment order may be renewed for successive periods equal to its original period of effectiveness if we receive a renewal notice prior to the order becoming ineffective.

A stop payment order against a Check must accurately describe it as to date, number, amount, and payee, and must correctly recite your name and the Account number. You agree that it is current industry standard to process stop payment orders by means of computer technology. Accordingly, your failure to provide the exact identification of Account number and Check number in order to identify the Check to be stopped will result in the Check being paid if presented, and we will not be liable for such payment. Errors in your name or the Account number, or inaccuracies in the description of the number, amount, issue date or payee on your written stop payment order shall relieve us from any liability for any mistaken payment or wrongful dishonor. Any errors on our written acknowledgment to you of a stop payment order, must be reported by you in writing to our Customer Service Department within 10 calendar days of the written acknowledgment date. We shall not be liable for any mistaken payment or wrongful dishonor occurring after the 10-day period, unless errors or inaccuracies are so reported to us within the 10-day period.

Before we will release a stop payment order, our Customer Service Department may require the receipt of a written request, signed by you, requesting the withdrawal of the order.

In the event we recredit the Account for a paid Check, then you hereby assign to us all rights against third parties. You or any joint account holder may order a stop payment. You agree that we will not be obligated to reimburse you immediately upon notice of alleged wrongful payment; that it is your obligation to prove the fact and amount of damage suffered; and that in no case will we be liable for more than your actual damage.

NHEAGMT2 (07/04)



ERA-MULTI-V1_2

We shall not be liable for any damages unless we have failed to act in good faith and exercise ordinary care. You agree to indemnify us and hold us harmless from any and all expenses incurred or damages suffered by us in honoring a stop payment order.

To place a stop payment order, write to National City, Equity Reserve Stop Payment Department, 4661 E. Main Street, Columbus, Ohio 43251-0928.

**Termination of Line.** Bank can terminate your Line and require you to pay the entire outstanding balance in one payment if you breach a material obligation of this Agreement in that:
- You engage in fraud or material misrepresentation in connection with your Line.
- You do not meet the repayment terms of this Agreement.
- Your action or inaction adversely affects the collateral or Bank's rights in the collateral.

To the extent permitted by 11 USC 506, Bank shall be entitled to reasonable court costs and attorneys' fees for independent counsel that Bank hires (unless you are a resident of New Hampshire, in which case we may not recover our attorneys' fees from you). Interest after termination, whether prior to or after judgment by a court of competent jurisdiction, shall accrue upon the outstanding unpaid balance at the rate determined under this Agreement until such balance is paid in full.

**Suspension or Reduction of Credit Line.** Bank can refuse to make additional extensions of credit or reduce your Line if you breach a material obligation of this Agreement in that:
- The value of the Dwelling securing your Line declines significantly below its present appraised value for purposes of the Credit Line.
- Bank reasonably believes you will not be able to meet the repayment requirements due to a material change in your financial circumstances.
- You are in default of a material obligation under this Agreement.
- Government action prevents the Bank from imposing the annual percentage rate provided for or impairs the Bank's security interest such that the value of the interest is less than 120 percent of the Credit Line.
- A regulatory agency has notified the Bank that continued Advances would constitute an unsafe or unsound practice.
- The maximum annual percentage rate is reached.

If your Line is suspended and you have used any FRP(s) then at Bank's option Bank may terminate the FRP(s) and transfer any FRP balances to your Line. Bank will give you written notice of any such action and conditions for reinstating your credit privileges. Bank may reinstate your credit privileges when the conditions leading to suspension are cured to Bank's satisfaction. Bank may require you to request reinstatement of credit privileges when the conditions leading to suspension or reduction of your Credit Line no longer exist. An additional title examination and other documentation may be required to reinstate your Line, and any costs associated with reinstatement will be paid by you where permitted by law.

**Change in Terms.** Bank may change certain terms of this Agreement at any time by giving you 15 days prior notice:
- The index and margin used for this Line if the original index is no longer available.
- A change that you specifically agree to.
- A change that benefits you.
- An insignificant change.
- Other changes permitted by applicable law.

Any change in terms will apply to balances outstanding on the effective date of the change as well as to balances generated thereafter.

**Other Provisions.** You shall promptly notify Bank of any change in circumstances which has a substantial adverse effect on your credit. You will furnish Bank with financial statements in a form satisfactory to Bank as Bank may request from time to time. Bank may also require a title examination and/or appraisal from time to time, the cost of which will be paid by you where permitted by law.

If this Agreement is signed by more than one borrower, each of you may draw Checks on the Line or use the Cards, and each and every borrower is jointly and severally liable for all Advances and charges on the Line. Any of you may direct Bank to not make further Advances on the Line, however, reinstatement will only be made on the joint request of all of you.

Your rights in your Line may not be assigned. The Mortgage may not be assumed by a subsequent purchaser of the Dwelling. All fees paid to Bank are not refundable.

All of Bank's rights under this Agreement are valid to the extent permitted by applicable law. If it is determined for any reason that any part of this Agreement is invalid or unenforceable, this shall not affect the validity or enforcement of any other provision, and this Agreement will then read as if the invalid or unenforceable part were not there.

Bank may delay exercising any of its rights under this Agreement without losing them. We may accept late payments or partial payments without losing any of our rights. If your payment is marked with the words "Paid in Full" or similar language, you must send your payment to National City, 6750 Miller Road, Brecksville, Ohio 44141, Locator No. 7107. If your payment is made to any other address, we may accept the payment without losing any of our rights.

You understand that Bank is a national bank located in Ohio, and that Bank's decision to extend the Line to you was made in Ohio. Therefore, this Agreement and your use of the Line, Credit Line, and Checks, shall be governed by and construed in accordance with (a) Federal laws and regulations including but not limited to 12 USC § 85 and (b) the laws of Ohio, to the extent Ohio laws are not preempted by federal laws or regulations, and without regard to conflict of law principles.

The annual IRS Form 1098 will be issued only to the first borrower listed on this Agreement at origination and the designation of a borrower as first cannot be changed subsequently.

An electronic or optically imaged reproduction of this Agreement or any other document related to your Loan constitutes an original document and may be relied on in full by all parties to the same extent as an original.

You can change any term of this Agreement only in a writing signed by us.

From time to time, we may offer you special rates for balance transfer transactions or introductory or promotional offers on your Line. If we do, we will advise you of the annual percentage rates and finance charges associated with the special rate offer, how long they will be in effect, the balances to which they will apply, and other terms of the special rate offer. Any special rate offer will be subject to the terms of the offer and this Agreement.

Except as otherwise prohibited by law, Bank may provide to others, including but not limited to, consumer credit reporting agencies, information about our transactions and experiences with you. Also, Bank and its affiliates (collectively "National City") may share with each other all information about you for the purposes, among other things, of evaluating credit applications or offering products and services that National City believes may be of interest to you. Under the Fair Credit Reporting Act there is certain credit information that cannot be shared about you (unless you are a business) if you tell National City by writing to National City Corporation, Attention: Office of Consumer Privacy, P.O. Box 4068, Kalamazoo, MI 49009. You must include your name, address, Line (account) number and social security number.

You agree that you and Bank have an established business relationship, and unless otherwise prohibited by law, that National City may contact you to offer you products and services that National City thinks may be of interest to you. Such contacts are not unsolicited, and National City may contact you with an automated dialing and announcing device or by fax, email or other form of electronic communication and we may monitor telephone calls with you to assure quality service.

In this Agreement, the term "affiliates" means current and future affiliates of Bank, including, but not limited to, the following National City Corporation subsidiaries: National City Bank of Indiana, National City Bank of Michigan/Illinois, National City Bank of Pennsylvania, National City Bank of Southern Indiana, National City Home Loan Services, Inc., First Franklin Financial Corporation, National City Bank of Kentucky, Madison Bank and Trust Company, National City Mortgage Co. and National City Mortgage Services Co.

NHEAGMT3 (07/04)

ERA-MULTI-V1_3

You are hereby notified that a negative credit report reflecting on your credit record may be submitted to a consumer (credit) reporting agency if you fail to fulfill the terms of your credit obligations. If you believe that we have information about you that is inaccurate or that we have reported or may report to a credit reporting agency information about you that is inaccurate, please notify us of the specific information that you believe is inaccurate by writing to National City, P.O. Box 94982, Cleveland, Ohio 44101, Attn: Credit Bureau Disputes, Locator 7113.

NOTICES. The following notices are given by Bank only to the extent not inconsistent with 12 U.S.C. Section 85 and related regulations and opinions, and/or the choice of law provision set forth herein (with respect to which Bank expressly reserves all rights). You acknowledge receipt of the following notices before becoming obligated:

If the Dwelling is located in California: Lender may, at its option, declare the entire balance of the Secured Debt to be immediately due and payable upon the creation of, or contract for the creation of, any lien, encumbrance, transfer or sale of the Property.

If the Dwelling is located in Colorado: If your payments are received after the due date, even if received before the date a late fee applies, you may owe additional and substantial money at the end of the credit transaction and there may be little or no reduction of principal. This is due to the accrual of daily interest until a payment is received.

If the dwelling is located in Connecticut: Your initial Draw Period will be 9 years 10 months and cannot be renewed for additional draw periods.

If the Dwelling is located in Florida: FLORIDA DOCUMENTARY STAMP TAX IN THE AMOUNT REQUIRED BY LAW HAS BEEN PAID OR WILL BE PAID DIRECTLY TO THE DEPARTMENT OF REVENUE, AND FLORIDA DOCUMENTARY STAMPS HAVE BEEN PLACED ON THE TAXABLE INSTRUMENTS AS REQUIRED BY CHAPTER 201, FLORIDA STATUTES.

If the Dwelling is located in Maryland: We elect Subtitle 9, Credit Grantor Open End Credit Provisions, of Title 12 of the Commercial Law Article of the Annotated Code of Maryland.

If the Dwelling is located in Minnesota: If the amount of this Loan is $100,000 or more, we elect Minn. Stat. § 334.01.

If the Dwelling is located in Missouri: Oral agreements or commitments to loan money, extend credit or to forbear from enforcing repayment of a debt including promises to extend or renew such debt are not enforceable. To protect you (borrower(s)) and us (creditor) from misunderstanding or disappointment, any agreements we reach covering such matters are contained in this writing, which is the complete and exclusive statement of the agreement between us, except as we may later agree in writing to modify it.

If the Dwelling is located in New York: YOU SHOULD CHECK WITH YOUR LEGAL ADVISOR AND WITH OTHER MORTGAGE LIEN HOLDERS AS TO WHETHER ANY PRIOR LIENS CONTAIN ACCELERATION CLAUSES WHICH WOULD BE ACTIVATED BY A JUNIOR ENCUMBRANCE.

DEFAULT IN THE PAYMENT OF THIS LOAN AGREEMENT MAY RESULT IN THE LOSS OF THE PROPERTY SECURING THE LOAN. UNDER FEDERAL LAW, YOU MAY HAVE THE RIGHT TO CANCEL THIS AGREEMENT. IF YOU HAVE THIS RIGHT, THE CREDITOR IS REQUIRED TO PROVIDE YOU WITH A SEPARATE WRITTEN NOTICE SPECIFYING THE CIRCUMSTANCES AND TIMES UNDER WHICH YOU CAN EXERCISE THIS RIGHT.

If the Dwelling is located in North Dakota: THIS OBLIGATION MAY BE THE BASIS FOR A PERSONAL ACTION AGAINST THE PROMISOR OR PROMISORS IN ADDITION TO OTHER REMEDIES ALLOWED BY LAW.

If the dwelling is located in Oregon: NOTICE TO THE BORROWER: Do not sign this loan agreement before you read it. The loan agreement may provide for the payment of a penalty if you wish to repay the loan prior to the date provided for repayment in the loan agreement.

If the Dwelling is located in Texas: THIS WRITTEN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

If the Dwelling is located in Vermont: NOTICE TO CO-SIGNER: YOUR SIGNATURE ON THIS NOTE MEANS THAT YOU ARE EQUALLY LIABLE FOR REPAYMENT OF THIS LOAN. IF THE BORROWER DOES NOT PAY, THE LENDER HAS A LEGAL RIGHT TO COLLECT FROM YOU.

COPY RECEIVED. You agree to be legally bound to all provisions of this Agreement. You acknowledge receipt of a completed copy of this Agreement, including important information below regarding your rights to dispute billing errors ("Your Billing Rights").

| REMOND K PALMER SR | X _[signature]_ SR |
|---|---|
| TYPE OR PRINT NAME | SIGNATURE |
| | X |
| TYPE OR PRINT NAME | SIGNATURE |
| | X |
| TYPE OR PRINT NAME | SIGNATURE |
| | X |
| TYPE OR PRINT NAME | SIGNATURE |

Address of Dwelling: ____701 ASBURY AVE ASBURY PARK____, New Jersey 07712

NHEAGMT4 (07/04)

ERA-MULTI-V1_4

# EXHIBIT B

RECORD & RETURN TO:
FIDELITY NATIONAL TITLE INS. CO.
121 HWY. 36, SUITE 230
WEST LONG BRANCH, NJ 07764

644649

This instrument was prepared by Melissa Johnson, National City Bank
100 Walnut Ave, 1ST Floor, Clark NJ 07066

RETURN TO:
NCB, CLS-BRECKSVILLE
LOCS, LOCATOR 7120
P.O. BOX 5570
CLEVELAND, OH 44101



MAR 24 2005     APR 8 2005

——— State of New Jersey ——————————————— Space Above This Line For Recording Data ———

# MORTGAGE
(With Future Advance Clause)

1. **DATE AND PARTIES.** The date of this Mortgage (Security Instrument) is .....March 10, 2005..................... and the parties, their addresses and tax identification numbers, if required, are as follows:

   MORTGAGOR: **REMOND K PALMER SR Unmarried**
   701 ASBURY AVE, ASBURY PARK, New Jersey, 07712

   . . .

   ☐ If checked, refer to the attached Addendum incorporated in this Security Instrument, for additional Mortgagors, their signatures and acknowledgments.

   LENDER: **NATIONAL CITY BANK**
   Locator #7116
   P.O. Box 5570
   Cleveland, OH 44101

2. **CONVEYANCE.** For good and valuable consideration, the receipt and sufficiency of which are acknowledged, and to secure the Secured Debt (defined below) and Mortgagor's performance under this Security Instrument, Mortgagor grants, bargains, conveys and mortgages to Lender the following described property:

   **SEE LEGAL DESCRIPTION**

   PALMER
   MORTGAGEDEED

   

   4489298120644192   XDXSJ3F

   INSTRUMENT NUMBER
   2005260662
   RECORDED ON
   APR 23, 2005
   9:16:46 AM
   BOOK: OR-8454
   PAGE: 9169
   Total Pages: 5
   COUNTY RECORDING  $70.00
   FEES
   TOTAL  $70.00

   M CLAIRE FRENCH CLK
   MONMOUTH COUNTY, NJ

   The property is located in .....Monmouth.................................................. at ................................
                                          (County)
   701 ASBURY AVE                    ASBURY PARK                                        07712
   ............................................., ..................................., New Jersey ................
       (Address)                      (City)                                            (ZIP Code)

   Together with all rights, easements, appurtenances, royalties, mineral rights, oil and gas rights, all water and riparian rights, ditches, and water stock and all existing and future improvements, structures, fixtures, and replacements that may now, or at any time in the future, be part of the real estate described above (all referred to as "Property").

3. **MAXIMUM OBLIGATION LIMIT.** The total principal amount secured by this Security Instrument at any one time shall not exceed $ ........200,000.00.......... . This limitation of amount does not include interest and other fees and charges validly made pursuant to this Security Instrument. Also, this limitation does not apply to advances made under the terms of this Security Instrument to protect Lender's security and to perform any of the covenants contained in this Security Instrument.

4. **SECURED DEBT AND FUTURE ADVANCES.** The term "Secured Debt" is defined as follows:
   A. Debt incurred under the terms of all promissory note(s), contract(s), guaranty(s) or other evidence of debt described below and all their extensions, renewals, modifications or substitutions. *(When referencing the debts below it is suggested that you include items such as borrowers' names, note amounts, interest rates, maturity dates, etc.)*

   Maturity Date: 3/10/2025

---

NEW JERSEY - HOME EQUITY LINE OF CREDIT MORTGAGE (NOT FOR FNMA, FHLMC, FHA OR VA USE)                    (page 1 of 4)
©1994 Bankers Systems, Inc., St. Cloud, MN Form OCP-REMTG-NJ 8/28/98

©1994 Bankers Systems, Inc., St. Cloud, MN Form OCP-REMTG-NJ 7/28/94
(page 2 of 4)

B. All additional sums advanced and expenses incurred by Lender for insuring, preserving or otherwise protecting the Property and its value and any other sums advanced and expenses incurred by Lender under the terms of this Security Instrument.

5. **MORTGAGE COVENANTS.** Mortgagor agrees that the promises to perform contained in this section constitute mortgage covenants and are material obligations under the Secured Debt and this Security Instrument. If Mortgagor breaches (fails to perform) any covenant in this section, Lender may refuse to make additional extensions of credit and reduce the credit limit. By not exercising either remedy on Mortgagor's breach, Lender does not waive Lender's right to later consider the event a breach if it happens again.

Payments. Mortgagor agrees that all payments under the Secured Debt will be paid when due and in accordance with the terms of the Secured Debt and this Security Instrument.

Prior Security Interests. With regard to any other mortgage, deed of trust, security agreement or other lien document that created a prior security interest or encumbrance on the Property, Mortgagor agrees to make all payments when due and to perform or comply with all covenants. Mortgagor also agrees not to allow any modification or extension of, nor to request any future advances under any note or agreement secured by the lien document without Lender's prior written approval.

Claims Against Title. Mortgagor will pay all taxes, assessments, liens, encumbrances, lease payments, ground rents, utilities, and other charges relating to the Property when due. Lender may require Mortgagor to provide to Lender copies of all notices that such amounts are due and the receipts evidencing Mortgagor's payment. Mortgagor will defend title to the Property against any claims that would impair the lien of this Security Instrument. Mortgagor agrees to assign to Lender, as requested by Lender, any rights, claims or defenses Mortgagor may have against parties who supply labor or materials to maintain or improve the Property.

Property Condition, Alterations and Inspection. Mortgagor will keep the Property in good condition and make all repairs that are reasonably necessary. Mortgagor shall not commit or allow any waste, impairment, or deterioration of the Property. Mortgagor agrees that the nature of the occupancy and use will not substantially change without Lender's prior written consent. Mortgagor will not permit any change in any license, restrictive covenant or easement without Lender's prior written consent. Mortgagor will notify Lender of all demands, proceedings, claims and actions against Mortgagor, and of any loss or damage to the Property.

Lender or Lender's agents may, at Lender's option, enter the Property at any reasonable time for the purpose of inspecting the Property. Lender shall give Mortgagor notice at the time of or before an inspection specifying a reasonable purpose for the inspection. Any inspection of the Property shall be entirely for Lender's benefit and Mortgagor will in no way rely on Lender's inspection.

Authority to Perform. If Mortgagor fails to perform any duty or any of the covenants contained in this Security Instrument, Lender may, without notice, perform or cause them to be performed. Mortgagor appoints Lender as attorney in fact to sign Mortgagor's name or pay any amount necessary for performance. Lender's right to perform for Mortgagor shall not create an obligation to perform, and Lender's failure to perform will not preclude Lender from exercising any of Lender's other rights under the law or this Security Instrument.

Leaseholds; Condominiums; Planned Unit Developments. Mortgagor agrees to comply with the provisions of any lease if this Security Instrument is on a leasehold. If the Property includes a unit in a condominium or a planned unit development, Mortgagor will perform all of Mortgagor's duties under the covenants, by-laws, or regulations of the condominium or planned unit development.

Condemnation. Mortgagor will give Lender prompt notice of any pending or threatened action, by private or public entities to purchase or take any or all of the Property through condemnation, eminent domain, or any other means. Mortgagor authorizes Lender to intervene in Mortgagor's name in any of the above described actions or claims. Mortgagor assigns to Lender the proceeds of any award or claim for damages connected with a condemnation or other taking of all or any part of the Property. Such proceeds shall be considered payments and will be applied as provided in this Security Instrument. This assignment of proceeds is subject to the terms of any prior mortgage, deed of trust, security agreement or other lien document.

Insurance. Mortgagor shall keep the Property insured against loss by fire, flood, theft and other hazards and risks reasonably associated with the Property due to its type and location. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Mortgagor subject to Lender's approval, which shall not be unreasonably withheld. If Mortgagor fails to maintain the coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property according to the terms of this Security Instrument.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard "mortgage clause" and, where applicable, "loss payee clause." Mortgagor shall immediately notify Lender of cancellation or termination of the insurance. Lender shall have the right to hold the policies and renewals. If Lender requires, Mortgagor shall immediately give to Lender all receipts of paid premiums and renewal notices. Upon loss, Mortgagor shall give immediate notice to the insurance carrier and Lender. Lender may make proof of loss if not made immediately by Mortgagor.

Unless otherwise agreed in writing, all insurance proceeds shall be applied to the restoration or repair of the Property or to the Secured Debt, whether or not then due, at Lender's option. Any application of proceeds to principal shall not extend or postpone the due date of the scheduled payment nor change the amount of any payment. Any excess will be paid to the Mortgagor. If the Property is acquired by Lender, Mortgagor's right to any insurance policies and proceeds resulting from damage to the Property before the acquisition shall pass to Lender to the extent of the Secured Debt immediately before the acquisition.

Financial Reports and Additional Documents. Mortgagor will provide to Lender upon request, any financial statement or information Lender may deem reasonably necessary. Mortgagor agrees to sign, deliver, and file any additional documents or certifications that Lender may consider necessary to perfect, continue, and preserve Mortgagor's obligations under this Security Instrument and Lender's lien status on the Property.

6. **WARRANTY OF TITLE.** Mortgagor warrants that Mortgagor has or will have full lawful ownership and possession of the estate conveyed by this Security Instrument and has the right to grant, bargain, convey, sell and mortgage the Property. Mortgagor also warrants that the Property is unencumbered, except for encumbrances of record.

7. **DUE ON SALE.** Lender may, at its option, declare the entire balance of the Secured Debt to be immediately due and payable upon the creation of, or contract for the creation of, a transfer or sale of the Property. This right is subject to the restrictions imposed by federal law (12 C.F.R. 591), as applicable.

## LEGAL DESCRIPTION

BEGINNING at point joined by the intersection of the North line of Asbury Avenue with the Westerly line of Bond Street at a marble line found thereat and running; thence

1. Along the Northerly line of Asbury Avenue North 74 degrees 45 minutes West, 50.00 feet to a point; thence

2. And parallel with the Westerly line of Bond Street, North 15 degrees 15 minutes East, 105.00 feet to a point; thence

3. And parallel with the Northerly line of Asbury Avenue South 74 degrees 45 minutes East, 50.00 feet to a point; thence

4. South 15 degrees 15 minutes West, 105.00 feet to the point or place of beginning.

FOR INFORMATION ONLY: Being known as Lot 1 in Block 151 on the Tax Map

MORTGAGEDEED_A

4469288120844192

8. **DEFAULT.** Mortgagor will be in default if any of the following occur:

   **Fraud.** Mortgagor engages in fraud or material misrepresentation in connection with the Secured Debt.

   **Payments.** Any party obligated on the Secured Debt fails to make a payment when due.

   **Property.** Any action or inaction occurs that adversely affects the Property or Lender's rights in the Property. This includes, but is not limited to, the following: (a) Mortgagor fails to maintain required insurance on the Property; (b) Mortgagor transfers the Property; (c) Mortgagor commits waste or otherwise destructively uses or fails to maintain the Property such that the action or inaction adversely affects Lender's security; (d) Mortgagor fails to pay taxes on the Property or otherwise fails to act and thereby causes a lien to be filed against the Property that is senior to the lien of this Security Instrument; (e) a sole Mortgagor dies; (f) if more than one Mortgagor, any Mortgagor dies and Lender's security is adversely affected; (g) the Property is taken through eminent domain; (h) a judgment is filed against Mortgagor and subjects Mortgagor and the Property to action that adversely affects Lender's interest; or (i) a prior lienholder forecloses on the Property and as a result, Lender's interest is adversely affected.

   **Executive Officers.** Mortgagor is an executive officer of Lender or an affiliate and Mortgagor becomes indebted to Lender or another lender in an aggregate amount greater than the amount permitted under federal laws and regulations.

9. **REMEDIES ON DEFAULT.** In addition to any other remedy available under the terms of this Security Instrument, Lender may accelerate the Secured Debt and foreclose this Security Instrument in a manner provided by law if Mortgagor is in default. In some instances, federal and state law will require Lender to provide Mortgagor with notice of the right to cure, or other notices and may establish time schedules for foreclosure actions.

   Accelerate the Secured Debt means that, at the option of the Lender, all or any part of the agreed fees and charges, accrued interest and principal shall become immediately due and payable, after giving notice if required by law, upon the occurrence of a default or anytime thereafter.

   The acceptance by Lender of any sum in payment or partial payment on the Secured Debt after the balance is due or is accelerated or after foreclosure proceedings are filed shall not constitute a waiver of Lender's right to require complete cure of any existing default. By not exercising any remedy on Mortgagor's default, Lender does not waive Lender's right to later consider the event a default if it happens again.

10. **EXPENSES; ADVANCES ON COVENANTS; ATTORNEYS' FEES; COLLECTION COSTS.** If Mortgagor breaches any covenant in this Security Instrument, Mortgagor agrees to pay all expenses Lender incurs in performing such covenants or protecting its security interest in the Property. Such expenses include, but are not limited to, fees incurred for inspecting, preserving, or otherwise protecting the Property and Lender's security interest. These expenses are payable on demand and will bear interest from the date of payment until paid in full at the highest rate of interest in effect as provided in the terms of the Secured Debt. Mortgagor agrees to pay all costs and expenses incurred by Lender in collecting, enforcing or protecting Lender's rights and remedies under this Security Instrument. This amount may include, but is not limited to, attorneys' fees, court costs, and other legal expenses. To the extent permitted by the United States Bankruptcy Code, *Mortgagor agrees to pay the reasonable attorneys' fees Lender incurs to collect the Secured Debt as awarded by any court exercising jurisdiction under the Bankruptcy Code.* This Security Instrument shall remain in effect until released. Mortgagor agrees to pay for any recordation costs of such release.

11. **ESCROW FOR TAXES AND INSURANCE.** Unless otherwise provided in a separate agreement, Mortgagor will not be required to pay to Lender funds for taxes and insurance in escrow.

12. **JOINT AND INDIVIDUAL LIABILITY; CO-SIGNERS; SUCCESSORS AND ASSIGNS BOUND.** All duties under this Security Instrument are joint and individual. If Mortgagor signs this Security Instrument but does not sign an evidence of debt, Mortgagor does so only to mortgage Mortgagor's interest in the Property to secure payment of the Secured Debt and Mortgagor does not agree to be personally liable on the Secured Debt. If this Security Instrument secures a guaranty between Lender and Mortgagor, Mortgagor agrees to waive any rights that may prevent Lender from bringing any action or claim against Mortgagor or any party indebted under the obligation. These rights may include, but are not limited to, any anti-deficiency or one-action laws. The duties and benefits of this Security Instrument shall bind and benefit the successors and assigns of Mortgagor and Lender.

13. **SEVERABILITY; INTERPRETATION.** This Security Instrument is complete and fully integrated. This Security Instrument may not be amended or modified by oral agreement. Any section in this Security Instrument, attachments, or any agreement related to the Secured Debt that conflicts with applicable law will not be effective, unless that law expressly or impliedly permits the variations by written agreement. If any section of this Security Instrument cannot be enforced according to its terms, that section will be severed and will not affect the enforceability of the remainder of this Security Instrument. Whenever used, the singular shall include the plural and the plural the singular. The captions and headings of the sections of this Security Instrument are for convenience only and are not to be used to interpret or define the terms of this Security Instrument. Time is of the essence in this Security Instrument. This means that any times stated in this Security Instrument must be strictly complied with and that failure to comply will constitute a material breach of this Security Instrument.

14. **NOTICE.** Unless otherwise required by law, any notice shall be given by delivering it or by mailing it by first class mail to the appropriate party's address on page 1 of this Security Instrument, or to any other address designated in writing. Notice to one mortgagor will be deemed to be notice to all mortgagors.

15. **WAIVER OF CLAIM OF CREDIT FOR TAXES.** Mortgagor will not make or claim credit on or deduction from the principal or interest on the Secured Debt by reason of any municipal or governmental taxes, assessments or charges assessed upon the Property, nor claim any deduction from the taxable value of the Property by reason of this Security Agreement.

16. **LINE OF CREDIT.** The Secured Debt includes a revolving line of credit. Although the Secured Debt may be reduced to a zero balance, this Security Instrument will remain in effect until released.

17. **APPLICABLE LAW.** This Security Instrument is governed by the laws as agreed to in the Secured Debt, except to the extent required by the laws of the jurisdiction where the Property is located, and applicable federal laws and regulations.

*(page 3 of 4)*

18. **RIDERS.** The covenants and agreements of each of the riders checked below are incorporated into and supplement and amend the terms of this Security Instrument.
   [Check all applicable boxes]
   ☐ Assignment of Leases and Rents  ☐ Other ..................................................................................

19. ☐ **ADDITIONAL TERMS.**

**SIGNATURES:** By signing below, Mortgagor agrees to the terms and covenants contained in this Security Instrument and in any attachments. Mortgagor also acknowledges receipt of a copy of this Security Instrument on the date stated on page 1.

...................................................... Sr. (Seal)          ...................................................... (Seal)
(Signature)  REMOND K PALMER SR  (Date)          (Signature)                                    (Date)

Signed, sealed and delivered in the presence of:

......................................................                        ......................................................
(Witness)                                                                      (Witness)

**ACKNOWLEDGMENT:**
(Individual)  STATE OF ...New Jersey..., COUNTY OF ...Monmouth... } ss.
On this ...28... day of ...March... 2005 ............ before me personally appeared
...REMOND R. PALMER SR...
who, I am satisfied, ......is...... the maker(s) of the instrument, and acknowledged that the instrument was executed as the maker's own act.
My commission expires:
(Seal)
                                              ......................................................
                                              (Notary Public)
                                              Shawnda Navarro Hughes
                                              Attorney at Law-State of NJ

**EXHIBIT C**

NOV 22 2010

R+R;

Lynx Asset Services, LLC
30 Freneau Ave.
Matawan, NJ 07747    732 210 2063



This space for Recorder's use

| | Recording Requested By: | When recorded mail to: |
|---|---|---|
| Case Nbr: 11133820 | Prepared By: | |
| Ref Number: 8120644192 | PNC Bank N.A. | |
| Property Address: | | |
| 701 ASHBURY AVE | | |
| ASBURY PARK, NJ 07712 | | |
| NJ0-AM    8/12/2010 | | |

NCC ID# 669  DBI ID# 146630

## ASSIGNMENT OF MORTGAGE

For Value Received, the undersigned holder of a Mortgage (herein "Assignor") whose address is 6750 Miller Road, Brecksville OH 44141 does hereby grant, sell, assign, transfer and convey unto Lynx Asset Services, LLC whose address is 30 Freneau Ave - Matawan, NJ 07747 all beneficial interest under that certain Mortgage described below together with the note(s) and obligations therein described and the money due and to become due thereon with interest and all rights accrued or to accrue under said Mortgage.

Original Lender:      NATIONAL CITY BANK
Borrower(s):          REMOND K PALMER SR UNMARRIED
Date of Mortgage:     3/10/2005
Original Loan Amount: $200,000.00

2005562662

Recorded in Monmouth County, NJ on: 4/23/2005, book OR-8454, page 9169 and instrument number N/A

IN WITNESS WHEREOF, the undersigned has caused this Assignment of Mortgage to be executed on 8/12/2010

PNC BANK, N.A. SUCCESSOR BY MERGER TO
NATIONAL CITY BANK

By: _____
Angela Venner, President

State of SC, County of Lexington

On 8/12/2010, before me, Peggy D. Williams, a Notary Public, personally appeared Angela Venner, President of PNC BANK, N.A. SUCCESSOR BY MERGER TO NATIONAL CITY BANK personally known to me, or proved to me on the basis of satisfactory evidence, to be the person(s) whose name(s) is/are subscribed to the within document and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity (ies), and that by his/her/their signature(s) on the document the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.

_____
Notary Public Peggy D. Williams
My Commission Expires: 2/17/2015

**PEGGY D. WILLIAMS**
Notary Public
State of South Carolina
My Commission Expires February 17, 2015

M CLAIRE FRENCH, CTY CLK
MONMOUTH COUNTY, NJ
INSTRUMENT NUMBER
201011245
RECORDED ON
Nov 22, 2010
3:09:03 PM
BOOK=OR-8863
PAGE=4833
Total Pages: 1
COUNTY RECORDING FEES  $40.00
TOTAL PAID            $40.00

# EXHIBIT D

RECORDED AS A LIEN JAN 30 2014

Michael A. Alfieri, ESQ. / NJ ID# 005021989
30 Freneau Avenue
Matawan, NJ 07747
732-360-9266
ATTORNEY FOR THE PLAINTIFF

JAN 16 2014

| | |
|---|---|
| Plaintiff<br>Lynx Asset Services, LLC<br><br>VS.<br><br>Defendant(s)<br>Remond K. Palmer, Sr. | : SUPERIOR COURT OF NEW JERSEY<br>: LAW DIVISION<br>: MONMOUTH COUNTY<br>: DOCKET NO. L-3985-13<br>: CIVIL ACTION<br>:<br>:<br>: FINAL JUDGMENT BY DEFAULT |

The Defendant(s), Remond K. Palmer, Sr., having been duly served with process and a copy of the Complaint in the above entitled action, and having been defaulted for failure to answer, appear or otherwise move as to the Complaint, and the Defendant(s) not being infants or incompetent persons; and plaintiff having filed a certification setting forth a particular statement of the items of the claim, their amounts and dates, a calculation in figures of the amount of interest, the payments or credits, if any, and the net amount due;

FINAL JUDGMENT IS ON THIS 16th DAY OF January, 2014 signed and entered in the sum of $196,059.23 with costs, plus interest in favor of the plaintiff, Lynx Asset Services, LLC and against the Defendant(s), Remond K. Palmer, Sr.

If this is a money judgement of order, it will not automatically be recorded as a statewide lien. The judgement or order must be forwarded to the Superior Court Clerk in Trenton together with $35 filing fee.

Andrew M Graubard /ke
ANDREW M. GRAUBARD
DEPUTY CLERK SUPERIOR COURT

CERTIFIED AS A TRUE COPY
ANDREW M. GRAUBARD
DEPUTY CLERK SUPERIOR COURT

J019102-14